# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                    Case No. 8:24-cr-477-KKM-NHA

SHANNON PERNELL BROWN,

     Defendant.

_____

## <u>ORDER</u>

Defendant Shannon Pernell Brown fled from officers on his e-bike after officers attempted to conduct a traffic stop. Officers then apprehended Brown and recovered a loaded firearm, two containers of marijuana, and drug paraphernalia from a backpack and satchel on Brown's person. A grand jury indicted Brown for possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), possessing with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D), and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* Am. Superseding Indictment (Doc. 37).

Brown moves to suppress "the firearm, the ammunition, the marijuana and drug paraphernalia, along with any other derivative evidence," arguing that officers unreasonably seized him in violation of the Fourth Amendment

and selectively enforced traffic laws in violation of the Fourteenth Amendment. Amended Motion to Suppress (Am. MTS) (Doc. 66) at 12, 18. Brown also moves to suppress certain post-arrest statements, which the government now represents it will not introduce at trial, thereby mooting that portion of Brown's motion. *See* Am. MTS at 1–2, 21–22; Resp. (Doc. 46) at 9–10. After an evidentiary hearing, I find no basis to suppress the tangible evidence. I thus deny the remainder of Brown's motion.

## I.    BACKGROUND

On the evening of August 31, 2024, Tampa Police Department officers Tyler Wehby and Nico Vargas were on patrol in an unmarked, "covert" police vehicle equipped with lights and sirens. Hr'g Tr. (Doc. 74) at 7:5–8:10. Wehby observed Shannon Brown "exiting on an E-Bike in the residence of 3622 North 53rd Street," an address familiar to Wehby from previous narcotics investigations. *Id.* at 8:13–9:11, 22:19–23:7. Wehby observed that "[t]here was no rear light on the back side of [Brown's] e-bike" and that "as soon as [Brown] came out of the house . . . he went north and then went immediately west in the eastbound lanes" for "maybe 50 feet." *Id.* at 10:8–9, 15:1–7, 24:3–11. Based on those traffic infractions, Wehby activated his vehicle's lights and sirens to initiate a traffic stop of Brown. *See id.* at 7:5–8, 11:7–13. According to Wehby, Brown "looked back at us a couple times when our lights and sirens were on acknowledging that we were there and then decided to speed up faster on the

bicycle." *Id.* at 11:19–21, 77:12–15. Brown, on the other hand, says that he did not know the unmarked vehicle was a police vehicle. *Id.* at 105:5–106:3. Seeing no police insignia and believing the vehicle's "red lights" to be "emergency lights," Brown "pedaled faster" and turned onto 32nd Avenue to "just get out [of] the way of the car." *Id.* at 105:12–107:4, 107:13–23, 125:13–126:9.

Wehby continued to track Brown but "deactivated [his] emergency equipment and tried to turn off" so that officers Luke Phelan and Reed Donaldson—who responded to assist in a separate vehicle—could "maintain visual on the suspect." *Id.* at 12:2–11, 74:25–75:12. Wehby testified that both vehicles caught up to Brown when he "crashed the bicycle" as he made a lefthand turn "in between like a dirt spot when a road bends" at the intersection of 32nd Avenue and 52nd Street. *Id.* at 12:15–13:4, 31:6–8. Wehby denied "conduct[ing] any type of tactical maneuvers to impede Mr. Brown's path of travel." *Id.* at 69:6–12. Officer Donaldson testified similarly. Once he arrived at the vicinity, Donaldson observed Brown traveling east before Brown "made a northbound turn . . . where he lost control and fell off the bike" while "going over the grass or the gravel" in a yard. *Id.* at 85:20–86:8. Both officers testified that Wehby's vehicle never struck Brown's e-bike. *Id.* at 69:2–5, 86:9–10.

According to Brown, as he was "riding eastbound on 32nd," Wehby's vehicle came behind him without emergency lights on and "forced [him] into

the opposite lane" such that the two became positioned in parallel. *Id.* at 109:14–21, 110:17–111:2. As Brown and Wehby approached 52nd Street, Brown claims Wehby's vehicle, "just out of nowhere, just with no warning, nothing, just turn[ed]," forcing Brown to hit his brakes and turn to the left to avoid being struck.[1] *Id.* at 111:6–12, 111:22–112:15, 113:1–11. Brown "los[t] control" and "fl[ew] off [his] bicycle." *Id.* at 113:9–11. Like Wehby and Donaldson, Brown testified that Wehby's vehicle did not contact him or his e-bike before he lost control and fell. *Id.* at 124:15–16.

After Brown lost control of his e-bike, he was positioned on the ground between both police vehicles and, according to Donaldson, "in between a fence, like a four-foot chain link fence and [Donaldson's] vehicle." *Id.* at 86:11–20. Donaldson further testified that when Brown fell off his e-bike, Donaldson exited his vehicle and said "hey, stop, police." *Id.* at 87:7–8. Brown "began to flee south along the fence . . . at which time Officer Phelan tackled him to the

---

[1] The government and Brown introduced recordings from Wehby's and Vargas's body worn cameras showing two different angles from inside the unmarked vehicle. *See* Gov't Ex. 1 (Wehby Body Cam); Def. Exs. 1A (Wehby Body Cam), 5A (Vargas Body Cam). Wehby's body cam shows him moving the steering wheel to the left on two occasions in close succession. *See* Def. Ex. 1A at 00:07–12, 00:14–16; *see also* Def. Ex. 5A at 00:25–40. According to Wehby, the first "left turn, the jerk of the wheel, was [him] going around the defendant so the covert vehicle behind [him] can still maintain visual eyes on the defendant." Hr'g Tr. 39:11–16. And "the second left would be [him] turning northbound onto 52nd Street from 32nd Ave." *Id.* at 39:23–40:2. I find that testimony credible.

ground."[2] *Id.* at 86:25–87:3. Donaldson recalled "a little bit of a struggle" before the officers subdued Brown as he initially "refused to cooperate and put his hands behind his back" *Id.* at 87:16–21. Wehby then "assisted by placing [Brown] in handcuffs and . . . observed two bags on his person" and smelled an "odor of marijuana" coming from the bags. *Id.* at 16:3–7. Officers placed Brown under arrest and searched a multicolored backpack and white satchel recovered from Brown's person. *Id.* at 18:10–22. Officers located marijuana and paraphernalia inside Brown's backpack and a firearm inside his satchel. *Id.*; *see also* Gov't Ex. 1; Gov't Ex. 3 at 02:01–02:59, 03:27–03:40.

While in custody, Brown also made several incriminating statements to officers without first having his *Miranda* rights read. *See* Am. MTS at 21–22; Resp. at 8–10; *cf.* Hr'g Tr. at 78:23–79:17. Brown moves to suppress those statements under the Fifth Amendment. *See* Am. MTS at 18–21. The government agrees that it will not introduce at trial—in written, audio, or video format—any statements that Brown made directly to the arresting officers. *See* Hr'g Tr. at 79:7–81:16. Conversely, the government may introduce

---

[2] Brown claims that he complied with Donaldson's command to stop but was "ambushed from behind." Hr'g Tr. at 119:18–22. Body camera footage contradicts Brown's account. Notably, Donaldson's body cam shows that Brown's e-bike is visible multiple feet from where officers subdued and handcuffed Brown. Gov't Ex. 3 at 00:31–00:34; *see also* Hr'g Tr. at 90:24–91:1. Likewise, Wehby's body cam shows that Wehby ran past the location of Brown's e-bike when Wehby exited the vehicle in pursuit of Brown, who appears to be traveling toward the fence line. Gov't Ex. 1. at 00:29–31.

at trial statements that Brown made to his sister, whom he called to pick up his e-bike. *Id.* at 81:3–11, 81:20–24. There, Brown told his sister, "Yeah, I'm going to jail. I got caught with a gun and a bunch of weed. I was on my way to a party." Gov't Ex. 5A at 6. Brown does not object to the admissibility of those statements, which counsel conceded Brown made "freely" and not in response to interrogation. Hr'g Tr. at 82:4–17. Accordingly, I address only Brown's request to exclude tangible evidence.

## II.    LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. "A Fourth Amendment violation can trigger the exclusionary rule, which requires courts to suppress illegally obtained evidence." *United States v. Watkins*, 13 F.4th 1202, 1210 (11th Cir. 2021). But the exclusionary rule functions as a last resort and is reserved "only [for] where its remedial objectives are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs." *United States v. Delancy*, 502 F.3d 1297, 1314 (11th Cir. 2007) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The defendant ordinarily has the burden in a suppression hearing, but when "a defendant produces evidence that he was arrested or subjected to a

search without a warrant, the burden shifts to the government to justify the warrantless arrest or search." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).[3] "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## III. ANALYSIS

Brown makes two arguments in support of suppressing the physical evidence recovered from his satchel and backpack. First, Brown claims that Officer Wehby unreasonably seized him by running him off the road, in violation of his Fourth Amendment rights. *See* Am. MTS at 12. Second, Brown avers that he "was targeted by Tampa police officers in unmarked vehicles for selective enforcement of Florida's bicycle laws during nighttime hours," in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 13. Neither argument succeeds.

### A. Officers did not seize Brown within the meaning of the Fourth Amendment before he lost control of his e-bike

Officer Wehby attempted to conduct a lawful traffic stop of Brown, including with use of his lights and sirens. But because Brown failed to stop, Wehby never seized Brown's person while pursuing him on his e-bike. That

---

[3] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to the close of business on September 30, 1981. 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

alone proves fatal to Brown's core Fourth Amendment claim. From there, officers reasonably chased and subdued Brown, and they conducted a permissible search of Brown's belongings incident to his arrest. Suppression is not appropriate.

To start, an officer may initiate a traffic stop if he has "reasonable suspicion" to believe that a traffic violation has occurred. *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc). As Officer Wehby testified, he had two legitimate, traffic-related reasons to stop Brown. Hr'g Tr. at 10:8–9, 15:1–7, 24:3–11. First, Brown's e-bike did not have a functional red taillight visible as required by § 316.2065(7), Florida Statutes. *Id.*; *see* Gov't Ex. 2 (still-image from Wehby's body camera showing Brown's e-bike); *accord* Hr'g Tr. at 90:2–6. Brown did not testify to the contrary. *Id.* at 129:21–23. Second, Brown rode his e-bike "west in the eastbound lanes," against the natural flow of traffic, in violation of § 316.081, Florida Statutes. Hr'g Tr. at 15:1–7. Accordingly, Wehby had, at minimum, a reasonable suspicion to effectuate a stop and seize Brown's person.

Brown does not dispute that he committed at least one traffic violation but instead argues that Wehby's attempt "to effectuate a minor bicycle traffic infraction [stop] using any means necessary, such as running a cyclist off the roadway, is unreasonable from an objective standpoint," and thus amounts to

8

an "unreasonable seizure" in violation of the Fourth Amendment. Am. MTS at 12. Brown is incorrect.

To be sure, "the Fourth Amendment's protections kick in when an officer engages in a 'seizure of the person.'" *Watkins v. Davis*, __ F.4th __, 2025 WL 2730900 (11th Cir. Sept. 25, 2025) (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). While a traffic stop ordinarily qualifies as a seizure, the calculus changes the moment a suspect flees. As the Supreme Court explained in *Hodari D.*, an officer effects a "seizure of the person" either by using force or by securing the person's "*submission* to the assertion of authority." 499 U.S. at 626. When an officer shows authority by activating his vehicle's lights and sirens, for example, he does not seize a fleeing suspect until the suspect submits. *Id.*; *see Torres v. Madrid*, 592 U.S. 306, 311 (2021) (explaining that a show of authority does not result in a seizure "until the arrestee complies with the demand"). But an individual is not seized if he is stopped by different means, such as losing control of his vehicle. *See Brower v. County of Inyo*, 489 U.S. 593, 597 (1989); *see also Purvis v. City of Orlando*, 273 F. Supp. 2d 1321, 1326 (M.D. Fla. 2003) ("Police pursuit in attempting to seize a fleeing suspect does not constitute a Fourth Amendment violation."). Despite testifying that he did not recognize Wehby's vehicle as a police vehicle, Brown concedes that he never stopped. Hr'g Tr. at 104:23–105:4. Brown thus was not seized by "*submission* to the assertion of authority." *Hodari D.*, 499 U.S. at 626.

Officer Wehby also did not seize Brown by force. Unlike with a show of authority, an officer can seize a suspect through force even where the force does not yield submission. *Id.* "Put another way, an officer's application of physical force to the body of a person 'for the purpose of arresting him' [is] itself an arrest—not an *attempted* arrest—even if the person d[oes] not yield." *Torres*, 592 U.S. at 311 (quoting *Hodari D.*, 499 U.S. at 624). In *Torres*, for example, officers seized a fleeing suspect by shooting and striking her person—even though she temporarily eluded apprehension—because "the officers' shooting applied physical force to her body and objectively manifested an intent to restrain her from driving away." *Id.* at 318; *accord Watkins*, 2025 WL 2730900, at *7–10 (holding that officers effected a seizure by shooting *and* striking a fleeing suspect's vehicle during a pursuit). On the other hand, no seizure occurs where officers attempt to "disable [a] car" by "fir[ing] a single shot at a low angle, aiming for the lower portion of the tire" but "miss[] the tire and . . . d[o] not strike anyone or anything." *Troupe v. Sarasota County*, 419 F.3d 1160, 1164, 1167 (11th Cir. 2005); *see Watkins*, 2025 WL 2730900, at *10 (explaining that *Troupe*'s holding "makes sense even under *Torres* because no touch occurred when the bullet missed, so no 'force' took place, as the common law understood that concept").

Here, although Brown alleges that Wehby cut off his path of travel, it is undisputed that Wehby's vehicle never struck either Brown or his e-bike before

Brown lost control and wrecked. Wehby, Donaldson, and Brown each testified to that fact. *See* Hr'g Tr. at 69:2–5, 86:9–10, 124:15–16. Officer Wehby therefore did not seize Brown through either a show of authority or by force and thus did not "seize him in an unreasonable manner in violation of the Fourth Amendment." Am. MTS at 12. I deny Brown's motion to suppress evidence based on any "unreasonable seizure" related to the vehicle pursuit.

Of course, officers ultimately seized Brown during the subsequent foot pursuit. But despite intimating that the officers "form[ed] a dogpile to subdue him," while he "wail[ed] in pain," Am. MTS at 5, Brown never formally moves to suppress evidence on this basis. Hr'g Tr. at 135:8–136:13. Nor would he be successful in doing so. Insofar as Brown's "unreasonable seizure" argument also coalesces into an excessive force claim, Brown cites no authority for the proposition that suppression is a proper remedy for such a claim where the lawfulness of the arrest is undisputed and the force did not cause discovery of the evidence.[4] *See, e.g., United States v. Watson*, 558 F.3d 702, 705 (7th Cir.

---

[4] In any event, officers did not use unreasonable force here. By the time Brown fell off his e-bike, he had already fled from officers once, giving them probable cause for an arrest. *See, e.g., Barnes v. Felix*, 605 U.S. 73, 86 (2025) (Kavanaugh, J., concurring) ("Fleeing from the traffic stop could suggest that the driver is preparing to commit or has committed a more serious crime—and is attempting to evade detection or arrest."); *see also* § 316.1935(1), Fla. Stat. (making it unlawful for a vehicle operator to "willfully . . . refuse or fail to stop the vehicle in compliance with [an] order" from a law enforcement officer). I further find that, despite Donaldson's command to stop, Brown fled on foot and resisted the officers' attempts to arrest him. *See, e.g.,* Hr'g Tr. at 16:8–10, 87:7–16, 98:23–24; Gov't Ex. 3 at 00:31–00:34; *see also* § 843.02, Fla. Stat. (making it a misdemeanor to "resist, obstruct, or oppose" an officer's lawful

2009) (rejecting suppression based on excessive force claim because "when evidence is lawfully seized, police misconduct collateral to the seizure does not trigger the application of the exclusionary rule"); *cf. United States v. Joyner*, 899 F.3d 1199, 1206 (11th Cir. 2018) (per curiam) (affirming denial of motion for new counsel and holding that defense counsel correctly ignored defendant's position that "the police used excessive force when they arrested him and searched his car" because that argument "wouldn't keep the evidence [that defendant sought to suppress] from coming in at trial" (citation modified)).

Ultimately, then, because officers had at least reasonable suspicion to stop Brown and probable cause to arrest him, officers permissibly searched Brown's backpack and satchel incident to a lawful arrest. *United States v. Jean*, 636 F. App'x 767, 769 (11th Cir. 2016) (per curiam) ("We have found that searches of wallets or bags on or near the arrestee are valid searches incident to arrest under a variety of factual circumstances."); *see United States v. Rosenthal*, 793 F.2d 1214, 1232 (11th Cir. 1986), *modified*, 801 F.2d 378 (11th Cir. 1986) (per curiam) (upholding search of defendant's handbag incident to a

---

command). To the extent that officers used force to place Brown's arms behind his back, I find that the force used was reasonable in the light of Brown's efforts to elude and his refusal to comply with directions. *See Slicker v. Jackson,* 215 F.3d 1225, 1233 (11th Cir. 2000) (looking to "the need for the application of force" and "the relationship between the need and the amount force used" in evaluating officers' actions). More, "the extent of the injury inflicted" to Brown was limited. *Id.* Although Brown said he experienced pain when Donaldson restrained him, Brown did not ask for officers to transport him to the hospital. Hr'g Tr. at 122:1–15, 131:12–21.

lawful arrest). I therefore deny Brown's request to suppress "the firearm, the ammunition, the marijuana and drug paraphernalia." Am. MTS. at 12.

### B. Even if Brown could prove that officers selectively enforced traffic laws, the Fourteenth Amendment does not provide a basis to exclude evidence

Next, Brown argues that the firearm and narcotics must be suppressed because he "was targeted by Tampa police officers in unmarked vehicles for selective enforcement of Florida's bicycle laws during nighttime hours." Am. MTS at 13. According to Brown, the officers selectively enforced traffic laws against black bicyclists in violation of his equal protection rights under the Fourteenth Amendment. Am. MTS at 13–18. The government responds that "[n]o authority suggests that exclusion of evidence is an appropriate remedy for an alleged violation of the Equal Protection Clause." Resp. 7; *see also* Resp. Mot. to Continue (Doc. 56). I agree.

Selective enforcement of the laws based on race is presumptively unconstitutional. *Whren v. United States*, 517 U.S. 806, 813 (1996). But "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment" because "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* To be clear, in analyzing claims under the Equal Protection Clause, the Supreme Court has "never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a

13

court determines that a defendant has been the victim of prosecution on the basis of his race." *United States v. Armstrong*, 517 U.S. 456, 461 n.2 (1996); *see* Guy Rubinstein, *Selective Prosecution, Selective Enforcement, and Remedial Vagueness*, 2022 WIS. L. REV. 825, 837 (2022) (explaining that, "[t]he Court's comment [in *Armstrong*] concerning selective prosecution's remedial vagueness has been largely understood as applying with equal force to selective enforcement, at least since *Wren*"). But Brown's approach is at odds with the Supreme Court's directive "not [to] look behind an objectively reasonable traffic stop to determine whether racial profiling or a desire to investigate other potential crimes was the real motive." *Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011). And no controlling authority supports Brown's position.

Brown concedes that "[t]he Eleventh Circuit hasn't spoken definitively on this issue," but suggests the court has implied "that suppression may be an appropriate avenue to adjudicate such claims and to provide a defendant such a remedy should they prevail." Am. MTS at 15; *see* (Doc. 53) at 6. Brown is wrong. The unpublished Eleventh Circuit decision he relies on concluded only that the defendant—appealing from an order denying a motion to suppress— failed to produce evidence of selective enforcement, not that suppression would have been proper had he done so. *United States v. Lewis*, No. 22-14246, 2023 WL 6620313, at *2 (11th Cir. Oct. 11, 2023) (per curiam). And more importantly, *Lewis* favorably cites *Wren* for the proposition that "[t]he proper

14

remedy for selective-enforcement is a claim under the Equal Protection Clause rather than the Fourth Amendment." *Id; see also al-Kidd*, 563 U.S. at 739 (reaffirming *Wren*'s "unanimous opinion").

At least one other circuit has expressly rejected Brown's position. Noting that "no court . . . ha[d] ever applied the exclusionary rule for a violation of the Fourteenth Amendment's Equal Protection Clause," the Sixth Circuit refused to "to graft [the Fourth] Amendment's traditional remedy into the equal protection context" for two reasons. *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008), *abrogated in part on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). First, the court reasoned "from *Wren*"—in which a defendant challenged a pretextual stop—"that the evidence against [the defendant] would not be suppressed under the Fourth Amendment (even if the officers were improperly motivated by race)." *Id.* In other words, the Fourth Amendment's objective standard contradicts the scope of permissible inquiry under the Equal Protection Clause. Second, individuals may vindicate their Fourteenth Amendment rights through Section 1983 actions, and thus, before adopting the "extreme remedy" of suppression, "a court must be convinced of the inadequacy of civil suits to safeguard against constitutional violations."[5] *Id.* I am persuaded by *Nichols*'s reasoning.

---

[5] Even the lone out-of-circuit district court decision on which Brown relies considered the viability of civil remedies before excluding evidence. *See United States v. Bernard*,

Here, Brown fails to explain, let alone convince, why a Section 1983 action would be inadequate to remedy violations related to the Tampa Police Department's allegedly "sordid history of selectively enforcing Florida's bicycle traffic laws against black people." Am. MTS at 13. Thus, even assuming the Fourteenth Amendment provided a mechanism for suppression, it would not be appropriate here. I deny Brown's motion to suppress on this basis.

## IV.    CONCLUSION

Accordingly, Brown's Amended Motion to Suppress (Doc. 66) is **DENIED.** The government agrees that it will not introduce Brown's un-*Mirandized*, post-arrest statements to the arresting officers. The government may introduce the statements Brown made to his sister, as well as evidence derived from the lawful search of Brown's person and belongings, including the marijuana and firearm Brown is charged with illegally possessing.

**ORDERED** in Tampa, Florida, on November 19, 2025.

Kathryn Kimball Mizelle
United States District Judge

---

No. CR 09-2474 RB, 2011 WL 13277499, at *5–6 (D.N.M. Dec. 9, 2011) ("While it may seem out of step with current thinking to enlarge the reach of the exclusionary rule, this is an extraordinary case that cries out for an extraordinary remedy.").